U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 NOV 18   AM 9: 47

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,       )
                                )
                                )
        v.                      )        Case No. 5:14-cr-71-2
                                )
                                )
TERRELL SPRINGFIELD,            )
                                )
        Defendant.              )

**OPINION AND ORDER RE:**
**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND**
**REQUEST FOR A *FRANKS* HEARING**
**(Doc. 34)**

In February 2014, a Vermont State Police trooper stopped the vehicle in which defendant Terrell Springfield was traveling on Interstate 91 for driving in the left lane without passing another vehicle. Based on information gathered during and after the stop, police obtained a warrant to search the vehicle. The search yielded 1000 bags of heroin as well as other contraband. Springfield—a passenger—and the owner of the vehicle, Victoria Keithan, were subsequently indicted for conspiracy to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Springfield filed a motion seeking to suppress the evidence gathered during the search on the grounds that the vehicle was unlawfully stopped and the officers had no legal basis to continue to investigate the vehicle or its occupants following the stop. (Doc. 34.) The court conducted a hearing on Springfield's motion on October 28, 2014. In his original motion to suppress, Springfield also requested a *Franks* hearing, alleging that the arresting officers made false statements in their search warrant affidavits. Springfield has since withdrawn that request, as well as the portion of his motion to suppress that relates to the search of his vehicle and his detention. (Doc. 48.) The sole remaining issue is the constitutionality of the traffic stop. (*Id.*)

1

## I.   Factual Background

The following facts are drawn from testimony and evidence admitted at the suppression hearing as well as police affidavits.

On February 25, 2014, at about 10:30 a.m., Trooper Dan Bennett of the Vermont State Police was parked in his cruiser in the median between the north- and southbound lanes of Interstate 91 just south of Exit 3, close to mile marker 11.2.  His cruiser was facing the northbound lane.  He testified that he was engaged in motor vehicle enforcement, and was not on the lookout for any particular vehicle.

Video footage from Bennett's cruiser camera was admitted into evidence at the suppression hearing.  The first forty seconds of the video shows a split screen, with the top half showing the view from a camera mounted inside the cruiser and pointed towards Bennett, and the bottom half showing the view forward from the front of the cruiser.

In the video, three cars traveling northbound in the right lane pass by the cruiser at timecodes 0:07, 0:08, and 0:09, followed by a car in the left lane at 0:10, a dark-colored pickup truck in the right lane at 0:12, and a light-colored car in the left lane at 0:13.  At 0:14, the black Ford Explorer in which defendant Terrell Springfield is traveling passes by in the left lane. Bennett turns his head to his left, or northward, and looks in that direction for about ten seconds. Bennett testified that during that time, he was watching the Explorer as it continued to travel in the passing lane without passing any vehicles.  He testified that he stops vehicles one to two times per week for driving in the left lane without passing.  He typically issues a warning rather than a ticket.

Twenty-four seconds into the video, a tractor-trailer marked with the insignia of Cabot Creamery passes by the cruiser in the right lane.  Bennett pulls onto the left lane of the highway at 0:32, and shortly afterward switches off his internal camera so that only the view from the front of the cruiser can be seen.  Springfield's Explorer is not visible in the video at this point, although the Cabot tractor-trailer can be seen ahead in the distance.  Bennett passes the Cabot tractor-trailer at 1:01 and pulls into the right lane behind the Explorer at 1:36.  Both vehicles come to a stop on the right shoulder of the highway at 1:55, next to mile marker 12.8.  From the time that Bennett starts his cruiser until he pulls over the Explorer, no vehicles other than the

2

Cabot tractor-trailer are visible on the northbound side of the highway.  It is undisputed that the Explorer had already passed the tractor-trailer when Bennett first saw it, and that the Explorer remained ahead of the tractor-trailer and was in the right lane when Bennett pulled it over.

In his affidavit in support of the search warrant, Trooper Bennett stated that he stopped defendant's vehicle for driving in the left lane without passing:

> I observed that [defendant's] vehicle was not passing any vehicles and that there were no vehicles in the primary lane for the vehicle to pass.  I further observed the Explorer to continue traveling in the passing lane without having a vehicle to pass for approximately one mile.  Placards indicating that vehicles must stay to the right, except when to pass, are posed throughout Interstate 91.  This is a violation of Title 23 VSA Section 1004(a).  (Doc. 34-1 at 2.)

After watching the video at the suppression hearing, Trooper Bennett stated that his affidavit was inaccurate and the Explorer was in the passing lane for "maybe half a mile."

Upon stopping the Explorer, which had Vermont license plates, Trooper Bennett approached the passenger side of the vehicle.  He requested identification and informed Springfield and the driver of the vehicle, Jonathan Luna, that he had pulled them over for travelling in the passing lane.[1]  Springfield's New York identification card and Luna's New York driver's license stated that both men were from New York City.  (*Id.*)  Both men are African American. (Doc. 47 at 7.)

While speaking to Springfield and Luna, Bennett observed a strong odor of burnt marijuana emanating from the vehicle.  (Doc. 34-1 at 2.)  He asked the occupants how much marijuana they had smoked.  Springfield said that he had smoked marijuana prior to their trip. While speaking to Luna and Springfield, Bennett also observed several air fresheners, "blunt guts" and a plastic bag that appeared to contain a white substance under the front seat, and what appeared to be bits of marijuana in the rear passenger seat foot well.[2]  (*Id.*)  Bennett ordered Luna out of the Explorer and spoke to him in the front seat of the police cruiser.  Luna stated that he had known Springfield for seven years, but did not know his real name.  He told Bennett that the Explorer belonged to a friend of Springfield's and that Springfield had borrowed the vehicle

---

[1]  The driver, Jonathan Luna, was not indicted in this court.

[2]  "Blunt guts" are the discarded contents of cigars which have been hollowed out to accept marijuana.

so that Luna could visit family in New Hampshire.  Luna told Bennett that Springfield had been driving earlier in the trip.  Springfield does not have a driver's license, and denied driving the Explorer.  Bennett observed that Luna "was rambling on and on."  (Doc. 34-1 at 3.)

Vermont State Police Sergeant Eric Albright arrived on the scene and observed the same drug-related items in the Explorer.  He noted that there were two cheap cellular phones on the center console and that Springfield had a separate iPhone.  He also observed a wallet with what appeared to be "a siz[e]able amount of paper currency." (Doc. 34-1 at 4.)

The officers requested permission to search the Explorer, which both Luna and Springfield denied.  They then detained Luna and Springfield and transported them and their vehicle to the Vermont State Police Brattleboro barracks.  A drug detection dog was taken around the Explorer and alerted to the presence of contraband within.  (Doc. 34-1 at 5.)

Based on the above information, the officers obtained a warrant from Windham County Superior Court to search the Explorer.  (Doc. 34-1 at 6.)  They found 1000 bags of heroin, powder and crack cocaine, and a small amount of marijuana.  (Doc. 34-4 at 2.)  At some point, the officers learned that Springfield was the target of an ongoing heroin investigation conducted by the Vermont State Police in the Lyndonville area.  (Doc. 41 at 4.)

Springfield testified that at the time of the stop, he was in the passenger seat and Luna was driving.  He testified that the Explorer left the highway for gas at Exit 1.  After getting back on the highway, he recalled that Luna allowed the Cabot tractor-trailer to go by, then moved into the passing lane in order to pass the tractor-trailer and another car.  He testified that Luna slowed down when he saw the police cruiser and got into the right lane, where he remained until the trooper pulled them over.  Springfield admitted that he had smoked marijuana that morning in Connecticut prior to their trip, but denied that Luna was under the influence of marijuana or that either of them had smoked while driving.

## II.    Analysis

Under the Fourth Amendment, an officer conducting an investigatory traffic stop must "have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *United States*

4

*v. Harrison*, 606 F.3d 42, 45 (2d Cir. 2010) (quotation omitted).[3]  "'When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.'" *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994) (quoting *United States v. Cummins*, 920 F.2d 498, 500 (8th Cir. 1990), *cert. denied*, 502 U.S. 962 (1991)).  In making a reasonable-suspicion determination, the court must examine "the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.'"  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted).  Evidence gathered as the result of an illegal stop may be suppressed as "fruit of the poisonous tree." *Scopo*, 19 F.3d at 781 (quotation omitted).

In this case, the court must determine whether the events leading up to the stop provided an objective basis for a reasonable suspicion by the trooper that the driver of the Ford Explorer had committed a traffic violation.  Within this question are two subsidiary issues: (1) what traffic rules apply to a vehicle traveling in the left-hand passing lane of the divided interstate highway; and (2) what does the evidence, particularly the cruiser video, show about the operation of the vehicle in which defendant was a passenger?

The first issue is entirely a matter of law.  The Vermont statute cited by Trooper Bennett in his affidavit, 23 V.S.A. § 1004(a), provides that the state traffic committee[4] has authority to make rules governing vehicle traffic on interstate highways within Vermont.  Violations of rules made by the traffic committee are civil traffic violations.  23 V.S.A. §§ 1004(c), 2302(b).  Law enforcement officers are empowered to make arrests for violations of Title 23, which expressly incorporates violations of the interstate traffic rules.  23 V.S.A. § 1013.

Pursuant to its legislative authority, the traffic committee has promulgated a rule stating that while driving on interstate highways in Vermont:

---

[3]  Although either probable cause or reasonable suspicion suffices to justify a traffic stop, the court considers only whether the lower standard of reasonable suspicion is present.  In the case of minor traffic infractions not requiring further investigation or testing, the terms are essentially interchangeable because suspicion of wrongdoing and probable cause to issue a ticket or warning arise from the officer's first-hand observation of driving behavior.

[4]  The traffic committee is a legislatively created board consisting of the secretary of transportation, the commissioner of motor vehicles, and the commissioner of public safety.  19 V.S.A. § 1(24); 23 V.S.A. § 1003(a).

> Drivers shall keep to the right except to pass. If vehicles on the roadway are moving, in separate traffic lanes, the provisions of this article shall not be considered as prohibiting the vehicles in one lane overtaking and passing the vehicles in another lane either on the right or left. No movement may be made to the right or to the left upon the roadway unless and until such movement can be made with reasonable safety and then only after ample visible signal has been given to indicate the direction of movement.

14-053 Vt. Code R. § 4, art. 1.4.  The motor vehicle rule has three elements.  First, a driver who is not passing must travel in the right lane.  Second, when multiple vehicles are present and occupying different lanes, vehicles in either lane may pass vehicles in the other lane.  Third, a vehicle can change lanes only when it is reasonably safe and after using a turn signal.

The law is clear that use of the left lane is limited to passing, and motorists are obligated to pull back into the right lane after completing the maneuver.  As any driver knows, many vehicles travel in the left lane for reasons other than to pass.  The traffic rule recognizes this practice by implication since it permits passing in either lane.  Nevertheless, the rule requires traffic to keep right except when passing.  Widespread ignorance or violation of the rule does not remove it from the regulations any more than the common practice of driving a few miles over the speed limit alters that legal requirement.

The remaining question is whether the facts of the case, including the testimony of Trooper Bennett and defendant Springfield and the cruiser video, are sufficient to satisfy the Government's burden of proof by a preponderance of the evidence that the officer had a reasonable basis for suspecting that a violation of the above rule had occurred.  *See United States v. Medina*, 301 F. Supp. 2d 322, 328 (S.D.N.Y. 2004) ("The Government bears the burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop.").

Trooper Bennett did not observe the Explorer *before* it passed his location.  He does not attribute his decision to stop the vehicle to anything which occurred before he saw it.  His decision was based solely on what he saw at the time the Explorer passed him and in the subsequent ten seconds until it passed from view.  When he caught up with the Explorer just over a minute later, it was travelling in the right lane and its operation at that time did not provide any additional basis for the stop.  The Government's claim of reasonable suspicion to justify the stop is derived only from the trooper's observation of the Explorer during the initial ten seconds.

Because the cruiser was parked in the median facing the northbound lane at ninety degrees, the video camera captured the spacing of the vehicles as they passed. The video shows that the Explorer was the last in a group of seven closely-spaced vehicles traveling northbound in both lanes as they approached Exit 3. Four cars were located in the right lane; three, including the Explorer, were in the left. All seven cars passed the trooper within the space of seven seconds.

When the Explorer passed Trooper Bennett's cruiser, it was travelling in the left lane one second behind a light-colored car also in the left lane and two seconds behind a dark-colored pickup truck in the right lane. The Explorer formed part of a loose cluster of traffic, all moving at normal highway speeds and spaced at intervals of one or two seconds. The closest vehicle to the right of the Explorer was the pickup truck which was two seconds ahead. The closest vehicle behind the Explorer was a tractor-trailer which was ten seconds, or about one-fifth of a mile, behind the Explorer.

After watching the Explorer travel north for ten seconds, Bennett looked away and began preparing to pull onto the highway. Trooper Bennett testified that he made up his mind that the Explorer was violating the keep-right-except-to-pass rule during those ten seconds. He stated at the hearing that the Explorer was out of view when he pulled onto the highway, and it is not visible in the video footage at that point. He did not see the Explorer move from the left to the right lane.

In his affidavit, Trooper Bennett claimed that Springfield's vehicle remained in the left lane without passing for about one mile. At the hearing, he revised that estimate to "maybe half a mile." Yet the video shows that Trooper Bennett could not have observed Springfield's vehicle traveling in the left lane for that long. Prior to noticing the Explorer, Trooper Bennett was looking straight ahead or to his left. He was not watching the Explorer as it approached from the south, nor did he claim to have been doing so. He testified that he did not see the Explorer pass the Cabot tractor-trailer. Thus, it appears that Trooper Bennett first noticed the Explorer at the moment it passed his cruiser and watched the vehicle for only ten seconds, or about one-fifth of a mile at sixty miles per hour.

The issue presented by this case is whether these observations provide a sufficient factual basis for the trooper's determination that he had a reasonable suspicion of unlawful activity which justified the traffic stop. The court concludes that a single look at one vehicle, traveling with other traffic in both lanes, for a duration of ten seconds, is insufficient in this case to give rise to a suspicion that the driver was committing the infraction of failing to keep to the right.

The court begins its analysis with the obvious observation that there is nothing unlawful about driving in the left lane. Millions do it every day. The only requirement in Vermont as in other states is that vehicles use the left lane to pass and that they return to the right lane after signaling and when it is otherwise safe to change lanes. Simply observing a vehicle in the left lane gives rise to no suspicion of a violation. The officer must also have a reason to suspect that the driver is *not* passing another vehicle (or being passed by faster traffic on the right as contemplated by the rule) and that he or she has failed to return to the right lane at a time when it is safe to do so.

As the rule is drafted, reasonable suspicion would be present in the case of a car traveling in the left lane in the absence of other traffic. Such a vehicle would be passing no one and could return with safety to the right lane at any time. The presence of cars in both lanes, however, brings the other two elements of the traffic offense into play. These are whether the vehicle is engaged in passing and whether it is safe to return to the right lane.

The trooper's brief observation of the Explorer provided no opportunity to form a reasonable suspicion either that the Explorer and the other cars in the left lane were not passing slower moving traffic on the right or that the Explorer failed to move right when it was safe to do so. Both of these are elements of the traffic offense. As shown in the cruiser video, the trooper saw the entire group of cars pass him in the equivalent of a snapshot. It is not possible to compare the relative speed of the left- and right-hand lanes of traffic over time. Trooper Bennett could not recall whether the other cars exited the highway or whether the cars in the left lane in front of the Explorer passed other vehicles during the critical ten seconds of observation. When he pulled onto the highway to give chase, the Explorer was not visible. By the time Bennett caught up with the Explorer, the group of cars had dispersed and the Explorer was driving alone in the right lane.

8

Similarly, there was no opportunity for the trooper to determine whether the Explorer could safely move back into the right-hand lane during the ten-second period. The law and the evidence suggest that it was not safe for the Explorer to do so. According to the Vermont Driver's Manual, a safe following distance is four seconds behind the vehicle in front. *See* Vermont Department of Motor Vehicles, *Vermont Driver's Manual* 30-31 (2015), *available at* http://dmv.vermont.gov/publications/drivers; *see also* 23 V.S.A. § 1039 ("The driver of a vehicle shall not follow another vehicle more closely than is reasonable and prudent . . . ."). At sixty miles per hour, four seconds translates into a safe following distance of 350 feet.[5] When the trooper observed the group of vehicles, however, they were located within one or two seconds of one another. In particular, the pickup truck in the right lane was two seconds ahead of the Explorer, or half the following distance prescribed in the manual. The traffic manual prescribes a four-second gap, plus time to signal. Trooper Bennett could only recall that Springfield was in the left lane during the ten seconds after passing the cruiser; he could not remember anything about the other cars except that Springfield was not actively passing a car during that time.

At the hearing, the Government focused attention on the fact that the Explorer was ten seconds or approximately one-fifth of a mile ahead of the Cabot tractor-trailer. If the Explorer and the tractor-trailer had been the only vehicles on the road, the Explorer could have merged safely back into the right lane, and continuing to travel in the left lane would likely amount to a violation of the regulation. The court agrees with the parties that the tractor-trailer is a "red herring" and irrelevant to the determination of reasonable suspicion. (Doc. 47 at 2; Doc. 49 at 2.)

Other courts which have reviewed traffic stops prompted by similar keep-right-except-to-pass traffic regulations have ruled that a stop based on a single brief observation by the officer does not give rise to a reasonable suspicion of a violation. *See United States v. Garcia*, 976 F. Supp. 2d 856, 865-66 (N.D. Tex. 2013) (holding that twenty-five seconds was insufficient amount of time for officer to form reasonable suspicion that driver committed traffic violation by

---

[5] The exact speed of the Explorer when it passed the trooper is not known. But there is no indication that it was speeding. Springfield's testimony that the driver, Jonathan Luna, slowed somewhat when he caught sight of the cruiser is credible and consistent with the behavior of most motorists. For purposes of the "four-second rule," it makes little difference whether the Explorer was travelling at sixty or eighty miles per hour—in either case, the pickup truck in the right lane was less than four seconds ahead and a lane change would violate the safe following distance recommended by the Manual.

driving in left lane without passing); *Jaganathan v. State*, 438 S.W.3d 823, 828 (Tex. Ct. App. 2014) (holding that officer did not have sufficient time to conclude that driver violated stay-right-except-to-pass rule where officer observed driver in left lane for forty-five seconds, or eight-tenths of a mile). Courts have reached the opposite conclusion in cases in which the vehicle was alone or the officer followed the vehicle for a longer period. *See United States v. Walker*, 719 F. Supp. 2d 586, 593 (W.D. Pa. 2010) (holding that officer had probable cause to stop driver for violating "right lane" rule where officer observed vehicle traveling in left lane for three to five seconds, there was no other traffic on the road, and no left-hand turn would have been possible in the vicinity); *Deskins v. City of Bremerton*, No. C08-05127-RBL, 2009 WL 1247067, at *6 (W.D. Wash. May 4, 2009), *aff'd*, 388 F. App'x 750 (9th Cir. 2010) (holding that officer had probable cause to stop driver where she observed driver traveling in left lane for several miles "in the absence of any appreciable traffic"). The distinction between the two groups of cases is that in the first—as in this case—the observation time was too short for the officer to form a reasonable suspicion of a violation. In the second group, the observation time was much longer or, in the case of a car driving alone in the left lane, all the elements of the offense were unmistakably present.[6]

The Government observes that even a mistaken belief that a traffic offense has occurred is sufficient to give rise to a reasonable suspicion. *See United States v. Jenkins*, 452 F.3d 207, 212 (2d Cir. 2006) (affirming validity of stop where officer was mistaken in his belief that vehicle lacked rear license plate). In this case, there was no mistake. As the video demonstrates, the Explorer was driving in the left lane. What is missing was a reasonable basis for suspecting that the other elements of the offense were also present: failing to pass and failing to return to the right lane when safe. These are absent because the observation of a closely spaced group of cars occupying both lanes provides an insufficient basis to suspect that the Explorer was violating the keep-right-except-to-pass rule. The observation time was too short, and due to the presence of

---

[6] Similar rulings appear concerning the need for a reasonable period of observation by the officer before making a stop for other motor vehicle violations. *Compare United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996) (holding single instance of incursion into the breakdown lane insufficient to support suspicion of a violation of traffic regulation requiring vehicles to stay within lane of travel "as nearly as practical"), *with United States v. Ozbirn*, 189 F.3d 1194, 1199 (10th Cir. 1999) (holding that officer's observation of driver's incursion into breakdown lane twice in a quarter mile sufficient to give rise to a reasonable suspicion of traffic violation).

traffic in the right lane, there was a reason for the Explorer to remain in the left lane during the brief time it was visible to the trooper.  The stop was therefore an improper seizure, and the evidence obtained as a result of the stop must be excluded from trial.

The Government argues that even if the stop was illegal, suppression is inappropriate where police officers "have acted in good faith belief that their conduct was lawful, or if it only involved negligence." (Doc. 41 at 15.)  It is true that "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009).  The purpose of the exclusionary rule is "to deter police misconduct." *United States v. Leon*, 468 U.S. 897, 916 (1984).  Thus, the Supreme Court has held that where the police act "in objectively reasonable reliance on a subsequently invalidated search warrant," suppression is inappropriate because there was no police misconduct. *Id.* at 921; *see also Herring*, 555 U.S. at 137 (holding that exclusionary rule did not require suppression of evidence gathered as result of arrest where police acted in belief that there was outstanding arrest warrant but that belief turned out to be wrong due to negligent bookkeeping error by another police employee).  Similarly, the Court has held that the exclusionary rule did not apply to evidence obtained during a vehicle search conducted in reasonable reliance on binding judicial precedent that later turned out to be unconstitutional. *Davis v. United States*, 131 S. Ct. 2419, 2429 (2011).

The so-called "good-faith exception" articulated in *Leon* and *Davis* is inapplicable here, because the Government has not shown that Trooper Bennett was relying in good faith on a search warrant or binding appellate precedent regarding the keep-right-except-to-pass rule when the stop occurred.  *See United States v. Ganias*, 755 F.3d 125, 140 (2d Cir. 2014) (holding that government failed to meet burden of showing that its agents relied in good faith on search warrant or binding appellate precedent when they copied defendant's computer hard drives and retained files beyond scope of warrant for more than three years).  Rather, Trooper Bennett was relying on his subjective belief that the Explorer had violated the rule.  As the Supreme Court has explained, "simple good faith on the part of the arresting officer is not enough.  If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police." *Terry v. Ohio*, 392 U.S. 1, 22 (1968) (quotation omitted); *see also United States v.*

*Stewart*, 604 F. Supp. 2d 676, 682-83 (S.D.N.Y. 2009) ("The fact that an officer truly believed that he saw a violation does not necessarily make it reasonable for him to suspect that the violation occurred.").

Finally, the Government points to the "societal cost of suppressing the significant drug evidence found in Springfield's vehicle" and suggests that any error in pulling over the vehicle pales before the seriousness of the offense of distributing heroin. (Doc. 49 at 3.) But the Fourth Amendment standards concerning traffic stops apply to all motorists, not just those who are innocent of criminal activity. The purpose of the exclusionary rule is to deter future violations of the Fourth Amendment. *Davis*, 131 S. Ct. at 2426. If the court were to agree with the Government's argument and deny suppression here because it may set a criminal loose, then police will be encouraged to continue to conduct unreasonable traffic stops. *See Terry*, 392 U.S. at 12 ("[E]xperience has taught that [the exclusionary rule] is the only effective deterrent to police misconduct in the criminal context, and that without it the constitutional guarantee against unreasonable searches and seizures would be a mere 'form of words.'" (quotation omitted)). Upholding a stop for violating the keep-right-except-to-pass rule under the circumstances in this case would mean that police could stop any driver traveling in the left lane, however briefly and even if it was not safe to merge into the right lane. Such a practice is not contemplated by the traffic rule or by the Fourth Amendment.

## III.    Conclusion

For the foregoing reasons, defendant's motion to suppress is GRANTED. (Doc. 34.)

Dated at Rutland, in the District of Vermont, this 18th day of November, 2014.

_____
Geoffrey W. Crawford, Judge
United States District Court